## BLOWERS v. SOUTHERN RY.

EVIDENCE—NONSUIT—QUANTUM MERUIT.—Incompetent evidence admitted without objection becomes competent, and on motion of nonsuit the sufficiency of such evidence is for jury. In this case the evidence introduced being susceptible of the inference that a mail messenger ignorantly performed the services of transfer clerk for the railway company, and that such services were accepted by the company, knowing that it was its duty to transfer mails, the case should have been sent to the jury to pass on liability of defendant for such services.

Before TOWNSEND, J., Spartanburg, May, 1904. Reversed.

Action by Richard D. Blowers against Southern Railway. From judgment of nonsuit, plaintiff appeals.

*Messrs. Johnson & Nash,* for appellant, cite: *As to liability of defendant:* 4 Cyc., 320, 325; 14 Ency., 767, 768; Wood on Master and Servant, 103; 17 Ency., 1 ed., 340; 32 Mo. App., 103.

*Mr. C. P. Sanders,* contra, cites: *To recover compensation, services must have been rendered under contract expressed or implied:* 1 McC., 23; 8 Cyc., 245; 2 Mills R., 348; 20 John. R., 28; 14 Ency., 1 ed., 761. *Or with expectation of being paid, and that person benefited has reason to so know:* 20 Am. R., 347; 26 S. C., 610; 8 Cyc., 252; 26 Am. & Eng. R. R. Cas., 357. *Agent's authority to contract must be clearly shown:* 35 S. C., 521; 3 Rich., 46; 28 S. C., 159; Elliott on R. R., sec. 353.

January 16, 1905. The opinion of the Court was delivered by

MR. JUSTICE GARY. This is an action for compensation under an alleged implied contract for services rendered the defendant by the plaintiff. The appeal is from an order of

nonsuit. The complaint alleges that the defendant was engaged in the transportation of the United States mails over the lines of its railways to and from the city of Spartanburg, S. C., under a contract with the United States, by which it was the duty of the defendant to transfer all mails from one of its cars to the other, also to handle and guard such mails at its depot and deliver the same to the proper agents of the United States at the depot and transfer station. That the plaintiff, from the 1st day of July, 1894, until the 1st day of July, 1900, performed that duty at the request and with the knowledge and acquiescence of the defendant.

The answer of the defendant denied the material allegations of the complaint, and alleged that the contract entered into between the defendant and the government was fully performed to the satisfaction of the latter.

His Honor, the presiding Judge, granted an order of nonsuit on the ground that the proof failed to show any contract or meeting of the minds between the parties. The appeal assigns error in the ruling.

There was testimony tending to show that the plaintiff was a mail messenger under a contract between himself and the government. The duty of the messenger was to carry the Spartanburg mail from the postoffice to the train and from the train to the post office. The duty of the clerk was to transfer the mail from one train to another.

The plaintiff testified as follows : "Q. You acted as transfer clerk during the whole of that time? A. Yes, sir. Q. Under whose supervision would you do these things there at the depot? A. Under Mr. Irwin's direction. Q. W. P. Irwin? A. Yes, sir. Q. In what capacity was he acting? A. He was agent of the Southern Railway. Q. Did you ever have dealings with anybody else in regard to your duties as transfer clerk? A. No, sir. Q. You had been for quite a while mail messenger here in the city of Spartanburg, carrying mail backward and forward from the depot to the train? A. Yes, sir. Q. So the government would adver-

REP.] November Term, 1904.

tise for mail messenger to do this work? A. Yes, sir. Q. You and others would put in bids? A. Yes, sir. Q. In putting in your bid, didn't you calculate upon handling this mail, transfer it from car to car, from train to train? A. I don't know as I did. It didn't read that way. Q. I asked you if you didn't calculate on doing that—didn't you think you were getting pay from the government for doing it? A. No, sir. Q. Don't you know you didn't intend to charge the railroad company? A. I intended to charge them when I found it was their duty to do it. Q. Before you found out, didn't you do this work all along with no intention whatever of charging the railroad company? A. Not until I found out it was their duty. Q. When did you find out it was their duty? A. When Mr. Irwin told me it was the railroad company's duty. Q. Was it not after you lost the contract and Pollard had it? A. Yes, sir. Q. You heard some man talking to Pollard and tell Pollard it was not his duty to do it? A. Yes, sir. Q. That was the way you found out? A. Yes, sir. Q. During the time before you found out, while you were doing this work, you had no intention whatever of charging the railroad company? A. No, sir. Q. The government was paying you regularly? A. Was not then. Q. During the time you were doing it? A. Yes, sir, they were paying me for messenger service. Q. Up to the time Pollard got the job, the government paid you? A. Yes, sir. That is, not for transferring; they are two distinct things— one is a transfer clerk and the other is a mail messenger. That is the way the contract is let out. Q. The government paid you under your bid and you put in your bid against the government for this messenger work? A. Yes, sir. Q. You made your charges against the government? A. Yes, sir. Q. You make any charges against the railroad? A. No, sir. Q. You went along and did it, thinking you couldn't charge, and not intending to charge, the railroad? A. I didn't intend to charge until I found out I was doing work for the railroad company. Q. You had no idea or

intention of charging, you never made any demand upon the railroad during that time? · A. Not until I found it was not my duty to do the work.   Q. When complaints would come in regard to mail handled by the transfer clerk or between points where your duties as mail messenger ended or duties as transfer clerk began—when complaints would come in regard to mail handled between those two points, who would they come through?   A. Mr. Irwin, agent of the Southern Railway.   Q. Did the government ever complain to you in regard to packages lost or misplaced or anything else between the points where your duties as a transfer clerk began?   A. No, sir.   Q. Did the railroad, through Mr. Irwin, its agent, ever complain to you between the point where the transfer clerk's duties ended and the mail messenger's duties began?   A. No, sir; that always came through the government.   Q. Then the point between the mail messenger and the transfer clerk the government stopped and the railroad began?   A. Yes, sir.   Q. Was it not your intention at the time you performed these services to give them to the railroad?   A. No, sir.   Q. Did you intend to give them to anybody?   A. No, sir."

It may be that some of the testimony was incompetent. It was, however, introduced without objection.   The rule is thus stated in *Ashe* v. *R. R.*, 65 S. C., 134, 138, 43 S. E., 393: "If testiomny is received without objection, which would otherwise be incompetent, it becomes competent, and cannot be disregarded upon a motion for nonsuit, but its sufficiency must be left to the jury."

· The defendant knew that its contract was being fully performed to the satisfaction of the government.   The presumption is that it had knowledge of the agencies by which it was performing its contract with the government.   Furthermore, there was testimony to the effect that when complaints were made by the defendant as to the manner in which the plaintiff was discharging the duties of transfer clerk, they were communicated to the plaintiff through W.

P. Irwin, the agent of the defendant at Spartanburg. The foregoing testimony not only tends to show that the defendant had knowledge that the plaintiff was rendering services as transfer clerk, but likewise acquiescence on its part.

The principle applicable to this case is correctly stated in *Ex parte Aycock,* 34 S. C., 255, 256, 13 S. E., 450, wherein the Court says: "The general rule is that where one who is under no legal or moral obligation to do so, renders services to another at his request or with his knowledge and acquiescence, the law raises an implied promise, on the part of the person receiving the services to pay what they are reasonably worth. * * * There being nothing else to which the rendition of the services can be referred, the inference is that they were rendered upon an implied understanding that compensation was to be made * * * *unless the testimony shows that such was not the consideration upon which the services were rendered*" (italics ours).

The question whether this inference was rebutted by the testimony must be determined by the jury and not by the presiding Judge. The rule is thus set forth in 14 Enc. of Law (1st ed.), 767: "Where one person performs labor for another, the law presumes a request and a promise to pay what such labor is reasonably worth, unless it is understood that it is to be performed gratuitously, or it is performed under circumstances which repel the presumption of a promise that compensation shall be made." The testimony tends to show that the services were not rendered as a gratuity, but under a mistake on the part of the plaintiff as to his rights. In a note on page 767 of the 14 Enc. of Law (1st ed.), it is said: "It is well settled that if one man labors for another or renders him service in his business, and that other, knowing all the facts, stands by and sees what is done and makes no objection, he is estopped to deny that such services were rendered at his request," citing *Academy* v. *Allen,* 14 Mass., 176; and *Guild* v. *Guild,* 15 Pick (Mass.), 130. The foregoing authorities show that the ruling of the Circuit

Judge was erroneous, and that the case should have been submitted to the jury.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed and the case remanded to that Court for a new trial.